IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-1007

Filed 21 May 2024

Wake County, Nos. 15 JT 32-34

In the Matter of:

T.R.W., T.D.Y.J.W., T.Z.A.M.W.

Appeal by Respondent-Father from order entered 1 August 2023 by Judge Vartan A. Davidian in Wake County District Court. Heard in the Court of Appeals 30 April 2024.

*Robin E. Strickland for Petitioners-Appellees.*

*Jason R. Page for Respondent-Appellant Father.*

COLLINS, Judge.

Respondent-Father appeals from the trial court's order terminating his parental rights to Tiffany, Tara, and Terry on the grounds of neglect and willfully leaving the children in placement outside of the home for more than 12 months without showing reasonable progress in correcting the conditions which led to the children's removal.[1] Father argues that certain findings of fact are unsupported by clear, cogent, and convincing evidence, and that the remaining findings of fact do not support the conclusions of law that the children were neglected and that Father

---

[1] We use pseudonyms to protect the identities of the minor children. *See* N.C. R. App. P. 42.

showed a lack of reasonable progress in correcting the conditions which led to the children's removal. For the reasons stated below, we reverse the trial court's order.

## I. Background

Tiffany, Tara, and Terry, aged 14, 12, and 10 respectively, are the minor biological children of Father and Mother.[2] In December 2014, a report was made to Wake County Human Services ("WCHS") that raised concerns about the children's hygiene and the condition of the family's home, and alleged that the parents failed to meet the children's medical needs. In January 2015, WCHS filed a petition alleging that the children were neglected and obtained an order for nonsecure custody of the children. The children were adjudicated neglected in May 2015 and put into foster care placement, and the parents were ordered to comply with a case plan put into effect by WCHS. The trial court set the primary plan for the children of reunification.

The parents complied with the case plan and were granted a trial home placement from December 2015 through August 2016. In April 2016, the trial court entered an order that maintained the trial placement with the parents and maintained the primary plan of reunification, but it found an incident of domestic violence between the parents and that it was recommended that Mother complete a mental health assessment to address concerns arising from the domestic violence report.

---

[2] The children's biological mother is not a party to this appeal.

The trial court entered an order in July 2016 finding that Tiffany was regressing in her behavior and in school since returning to the parent's home but maintaining the trial home placement. In September 2016, the trial court terminated the trial home placement due to multiple reports of neglect and concerns about the children's hygiene. The trial court maintained the primary plan of reunification and adopted a secondary plan of guardianship in order to timely achieve permanence for the children.

In March 2017, the trial court entered an order changing the primary plan to guardianship and adopting a secondary plan of reunification. The trial court found that Father had suffered a stroke in 2016 and remained in a physical rehabilitation center, and that the parents were two months behind on rent. The trial court entered an order in August 2017 changing the primary plan to adoption and adopting reunification as a secondary plan; the court found that the parents had moved to South Carolina following Father's stroke in order to live with the maternal grandmother.

Tiffany was placed in foster placement with the Dempseys ("Petitioners") in September 2017, and Tara and Terry were placed in foster placement with Petitioners in February 2018. From October 2017 through June 2019, the trial court entered a series of orders that maintained the primary plan of adoption and the secondary plan of reunification; ordered WCHS to continue to make reasonable efforts towards accomplishment of the primary and secondary plans; ordered home studies of the

maternal grandmother's home in South Carolina; ordered WCHS to determine whether the children could be placed with maternal relatives in a guardianship placement; and ordered the parents to comply with WCHS recommendations. In November 2019, the trial court entered an order changing the primary plan to guardianship and adopting a secondary plan of reunification.

The trial court entered an order on 10 January 2020 finding that "[t]he primary plan of guardianship is being achieved at this time. No secondary plan is necessary." The trial court found that reunification efforts were not necessary as those efforts "clearly would be unsuccessful" because: the children had been in foster care for almost five years; a trial placement failed because the parents were unable to provide proper care and supervision for the children; the parents had moved to South Carolina following Father's stroke in order to be closer to family who could provide assistance and support; two home studies on the maternal grandmother's home were conducted and placement was twice denied; a parental capacity evaluation on the parents raised significant questions about the parents' abilities to meet the children's basic needs on a permanent basis; and the parents' support network for care of the children was not as dependable as the parents wanted to believe. The trial court found that the parents were unfit to have custody of the children and had acted inconsistently with their "Constitutionally-protected" parental status but that "[a] proceeding to terminate the parental rights of the children's parents [was] not necessary in order to perfect the primary permanent plan for the children because

the primary permanent plan for the children is guardianship . . . ."

The trial court's order concluded that it was in the children's best interests to be placed in guardianship with Petitioners and that it was in the children's best interests to waive all future hearings. The trial court relieved WCHS of supervisory responsibility for the family as it pertained to the children and released the guardian ad litem and the parents' court-appointed attorneys from their appointments. The trial court granted visitation to both parents, permitting visits with the children four times a year and telephone calls at least once per week.

Nearly two years after the entry of that order, on 13 October 2021, Petitioners filed a petition to terminate the parental rights of Father and Mother, alleging the following three grounds: neglect, willfully leaving the children in placement outside of the home for more than 12 months without making reasonable progress under the circumstances in correcting those conditions which led to the removal of the juveniles, and dependency. The matter came on for hearing on 5 April and 17 April 2023. The trial court entered an order on 1 August 2023 terminating the parents' rights to the children on the grounds of neglect and willfully leaving the children in placement outside of the home for more than 12 months without making reasonable progress. The trial court did not find grounds to terminate the parents' rights pursuant to dependency. Father properly noticed appeal on 18 August 2023.

## II.  Discussion

Father argues on appeal that (1) numerous findings of fact are unsupported by

clear, cogent, and convincing evidence; (2) "the competent findings fail to support the conclusion that [Father] would neglect his children in the future when a permanent plan of guardianship had been achieved, he visited the children when possible, he paid child support, and he called [the children] every week"; and (3) "the competent findings of fact fail to support the conclusion that [Father] did not make reasonable progress under the circumstances in correcting the conditions which led to the children's removal when guardianship had been in place for more than three years, he had maintained custody of his youngest child, and the reasons for the children's removal were no longer a concern[.]"

## A. Standard of Review

In a termination of parental rights proceeding, the trial court must adjudicate the existence of any grounds for termination alleged in the petition. At the adjudication hearing, the trial court must "take evidence [and] find the facts" necessary to support its determination of whether the alleged grounds for termination exist. N.C. Gen. Stat. § 7B-1109(e) (2023). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under N.C. Gen. Stat. § 7B-1111(a)." *In re A.L.L.*, 376 N.C. 99, 100, 852 S.E.2d 1, 4 (2020) (brackets and citation omitted). We review a trial court's adjudicatory findings of fact to determine whether they are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law. *In re K.N.*, 373 N.C. 274, 278, 837

S.E.2d 861, 865 (2020). Any unchallenged findings are "deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citations omitted). The trial court's conclusions of law are reviewed de novo. *In re K.N.*, 373 N.C. at 278, 837 S.E.2d at 865. "[I]f a finding of fact is essentially a conclusion of law[,] it will be treated as a conclusion of law which is reviewable on appeal." *In re M.N.C.*, 176 N.C. App. 114, 122, 625 S.E.2d 627, 632 (2006) (citation omitted).

## B. Legal Rules for Neglect and Lack of Progress

The first ground for termination found by the trial court was neglect under N.C. Gen. Stat. § 7B-1111(a)(1).[3] This subsection allows for parental rights to be terminated if the trial court finds that the parent has neglected their child to such an extent that the child fits the statutory definition of a "neglected juvenile." N.C. Gen. Stat. § 7B-1111(a)(1) (2023). A neglected juvenile is defined, in relevant part, as a juvenile "whose parent, guardian, custodian, or caretaker . . . [d]oes not provide proper care, supervision, or discipline" or who lives in an "environment that is injurious to the juvenile's welfare[.]" *Id.* § 7B-101(15) (2023). "[E]vidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights." *In*

---

[3] N.C. Gen. Stat. §§ 7B-1111 and 7B-101 were amended significantly in 2023. The current versions of the statutes became effective on 1 October 2023. However, as the trial court's order terminating Father's parental rights was entered on 1 August 2023, we cite to the versions of the statutes in effect on the order's date of entry.

*re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841, 851 S.E.2d 17, 20 (2020) (ellipses, quotation marks, and citations omitted).

The second ground for termination found by the trial court was lack of reasonable progress under N.C. Gen. Stat. § 7B-1111(a)(2). This subsection allows for termination of parental rights if the trial court finds that, as of the time of the hearing, the child has been willfully left in placement outside of the home for more than 12 months and that the parent has not made "reasonable progress under the circumstances to correct the conditions which led to the removal of the child." *In re O.C.*, 171 N.C. App. 457, 465, 615 S.E.2d 391, 396 (2005). The trial court may consider evidence of reasonable progress made by a parent "until the date of the termination hearing." *In re J.G.B.*, 177 N.C. App. 375, 385, 628 S.E.2d 450, 457 (2006) (citation omitted).

## C. Findings of Fact

The trial court made the following relevant findings of fact:

> 8. There is an existing child custody order in Wake County,

North Carolina juvenile court file . . . which grants Petitioners guardianship of the minor children.

9.  The minor children were removed from the parents in 2015 and were adjudicated neglected.

10.  Despite complying with their case plan, the parents were not able to demonstrate skills learned in their interactions with the minor children.  The Court notes that the parenting classes the parents completed was the Families on the Grow series which is a parenting curriculum for parents with cognitive deficits.  The children returned to the parents' home in December 2015 for a trial home placement, but this placement could not be sustained.  The children were once again removed on August 26, 2016 because the parents were unable to provide proper care and supervision for them.

11.  The father believes the children were removed from their care because he was at work and the mother did not have a car seat to put in a cab to transport the minor children.  The children were removed a second time due to the parents' inability to properly supervise the minor children in addition to a report of domestic violence and not because of an alleged lack of a car seat.

12.  In March of 2017 the parents moved to Orangeburg, South Carolina to be closer to family after the father suffered a stroke.  Their decision to move away from the minor children made visitation and reunification difficult.

13.  The parents have not been consistent with their visitation with the minor children.  From September 2017 through November 2019 they were allowed phone calls on Sundays at 5:30pm and visits on the 3rd Saturday of each month.  They missed over half of the calls and visits during this time period.

. . . .

15.  The parents attended the February 2020 visit at the Museum of Life and Science in Durham.  The maternal grandmother drove them to the visit along with the parents' three year old daughter.  The visit was scheduled from 10am until 4pm, but the parents arrived late at

11:05am. They left the area where the minor children were in order to take their three year old somewhere in the museum. The father returned after 20 minutes, and the mother returned 45 minutes after that. Then they sat on a bench and watched the children from a distance with no interaction. They left at 3:30pm with little notice to the minor children.

16. The parents elected not to visit in May 2020 due to COVID. Petitioners offered a FaceTime visit instead, but the parents did not respond.

17. The parents did not visit in August 2020. Petitioners booked tickets for the museum but never received a request or confirmation for a visit from either parent.

18. The mother, her three year old and the maternal grandmother came for the November 2020 visit. Petitioners planned to meet them at the gate of the museum at 10:30am. The maternal grandmother met with Petitioners and the minor children while the mother walked around the museum with the three year old until 11:15am. At 11:40am the mother left to go to her car but returned to the museum café for lunch with everyone at 12:05pm. At 2pm the mother, the three year old and the maternal grandmother left to go home. The mother and maternal grandmother did not interact with the minor children during the visit.

19. The mother and father did not request a visit for February 2021, May 2021, or August 2021.

20. The mother, the maternal grandmother, the father and the paternal grandparents attended the visit in November 2021. There was minimal interaction with the minor children.

21. The mother and father did not request to have visits in February and May of 2022.

. . . .

23. The mother and the father did not confirm the November of 2022 visit in sufficient time for the visit to occur. Petitioner Mariah Dempsey offered to reschedule

- 10 -

the visit for the following week. The parties agreed to have a visit at Frankie's Fun Park. The father attended the visit with his parents, his sister, his niece and his nephew. The father provided $20 for the minor children to share to play games, and he also provided each of the children with a Christmas gift. The father and his family spent little time interacting with the children. Instead, the father spent the majority of the visit walking around playing video games. At one point the father asked permission to take [Terry] with him to play a game, and Petitioners agreed. After five minutes, the Petitioners walked over to where the father was to check on [Terry], but the father was playing a video game alone without [Terry] anywhere in sight. Petitioner Mariah Dempsey walked around to look for [Terry], and she found him standing alone on the other side of the arcade.

. . . .

25. The mother sent a text to Petitioners stating that the parents would not be exercising their February 2023 visit.

26. The father consistently calls each Sunday at 5:30pm. He is appropriate during the call, but the calls do not last long as the minor children do not want to talk, and the father asks the minor children the same questions during each call.

. . . .

28. The parents have not attended to the children's physical, emotional or financial needs. They have not provided any financial support for the minor children, and they do not regularly provide gifts, cards or letters for the minor children. The father provided a small toy animal bucket for [Terry] and a bracelet set for [Tiffany] and [Tara] to share in December 2020. In January of 2021 the mother sent an online card to the minor children that said "hi." [Father and Mother] have not otherwise provided any birthday or Christmas gifts to the minor children since Petitioners have been the minor children's guardians. The mother claims that she has sent electronic gift cards to Petitioners, but Petitioners have not received them.

29. The parents could have continued to comply with the orders of the court in order to increase their visitation with the minor child[ren], but they elected not to do so.

30. North Carolina law gives guardians standing to file actions for termination of parental rights which is what Petitioners have done in this case. The parents do not get to continue neglecting their minor children just because the permanent plan has been achieved and then use that permanent plan as a shield from having their rights terminated.

31. The father is unable to drive legally at this time. He suffers from seizures, and each time he has a seizure, he must wait a minimum of six months before attempting to reinstate his driver's license. In addition, the father has some legal matters he must settle before he is eligible to obtain his driver's license.

32. The father relies on his family for transportation. He has had his parents drive him to visits with the minor children, or he has ridden with the maternal grandmother. He missed at least one visit with the minor children because his sister had COVID and the paternal grandfather had to care for her children and was unable to drive the father to the visit.

. . . .

34. The Court notes the parties have been able to maintain custody of their child who was born after the minor children in this matter were removed from their care. Their ability to successfully parent one child does not mean they would be able to successfully parent that child plus the three minor children subject to this action. The Court notes that while the parents have maintained custody of their other child, that child spends entire summers with the maternal grandfather, several nights per week with the maternal grandmother, and every other weekend with the father. As a result, the mother does very little actual parenting of the child, and the father only has the child for four overnights per month.

35. The parents' ability to properly supervise the minor

children is still a concern given the father's inability to adequately supervise [Terry] during the last visit and the mother's failure to interact with the minor children during her last several visits.

36. While the parents have been able to maintain custody of their youngest child, they still have an ongoing foster care case in Wake County with an older child who was removed in 2015 along with the other children. They still have not been able to reunify with that child. This shows that the conditions which brought the minor children into care still have not been corrected almost eight years later. The parents have willfully left the minor children in an out of home placement, and they have not made reasonable progress at correcting the conditions which brought the children into care.

. . . .

38. Other than maintain custody of their new child, the parents are in the same position as they were when the children initially came into care. They have not consistently visited with the minor children. They do not have suitable housing. There is no evidence before the court that they have received adequate mental health counseling.

39. The parents have neglected the minor children, and there is a probability of a repetition of neglect if the minor children were returned to their care. This is evidenced by the father's decision to play video games by himself during the most recent visit and by the mother electing to tour the museum with her other child instead of spending time with the minor children during their very limited visitation. Not only do the parents continue to neglect the minor children outside of visits, they neglect them during their visits as well.

40. The parental rights of the parents are subject to termination pursuant to N.C. Gen. Stat. § 7B-1111(a)(2) in that they willfully left the minor children in a placement out of the home for more than twelve months without showing to the satisfaction of the [c]ourt that reasonable progress under the circumstances has been made in

correcting those conditions which led to the removal of the juveniles, and poverty is not the sole reason they cannot care for the juveniles.

41. The minor children were originally removed from the parents' custody in 2015 due to their inability to properly care for the minor children. The parents technically "complied" with services in that they attended services, but they did not benefit from the lessons taught in their services.

. . . .

43. The parents have not sufficiently learned about the special needs of [Tiffany]. She attends school in an exceptional children's classroom and has a one-on-one aid during the school day. Since moving to Petitioners' home, she has surpassed the developmental and educational expectations of her doctors.

44. During visits the parents have sought the assistance of Petitioner Mariah Dempsey as well as that of their older son . . . to help with the minor children during the visit. [Their older son] is diagnosed with autism and has a moderate to severe intellectual disability, yet the father asked him to help with his younger siblings. The parents have had 8 years to remedy the conditions which brought the minor children into care, and they have not done so.

45. The parents have not provided for the day-to-day needs of the minor children. The father claims he has been paying child support, but it has not been received by Petitioners. The father asked Petitioner Mariah Dempsey if she had received any child support, and she told him [s]he had not. The father testified that he could not contact child support enforcement to determine where the money he was paying was going. He claimed that his work schedule and his doctor appointments prevent him from calling. The [c]ourt notes that the father works part-time, and that his doctor appointments are once every three months.

. . . .

59. The parents have shown a deliberate indifference

towards support and care of the minor children.

We note that many of these findings refer to "the parents" and their actions or inaction. However, as only Father is the appellant in this case, we review the findings as to their applicability to Father only. Father challenges findings of fact 13, 15-21, 23, 28-29, 31, 35-36, 38-39, 41, 43-44, and 59 as being unsupported by clear, cogent, and convincing evidence. We will review each challenged finding in turn:

### *Finding of Fact 13*

Finding 13 states:

> The parents have not been consistent with their visitation with the minor children. From September 2017 through November 2019 they were allowed phone calls on Sundays at 5:30pm and visits on the 3rd Saturday of each month. They missed over half of the calls and visits during this time period.

There is not clear, cogent, and convincing evidence to support that Father missed over half of the calls and visits during the time period of September 2017 through November 2019, as the record evidence shows that Father spoke with the children on a weekly basis and visited with the children on a monthly basis except for when he missed in-person visits in March 2018, May 2018, August 2018, June 2019, August 2019, and September 2019. The record evidence shows that, of the 27 in-person visits allowed during the relevant time frame, Father missed six. This finding also conflicts with Finding 26 which states that Father called consistently each Sunday at 5:30 p.m. and was appropriate during the phone calls.

***Finding of Fact 15***

Finding 15 states:

> The parents attended the February 2020 visit at the
> Museum of Life and Science in Durham. The maternal
> grandmother drove them to the visit along with the
> parents' three year old daughter. The visit was scheduled
> from 10am until 4pm, but the parents arrived late at
> 11:05am. They left the area where the minor children were
> in order to take their three year old somewhere in the
> museum. The father returned after 20 minutes, and the
> mother returned 45 minutes after that. Then they sat on
> a bench and watched the children from a distance with no
> interaction. They left at 3:30pm with little notice to the
> minor children.

There is not clear, cogent, and convincing evidence to support this finding of

fact. The only evidence about the February 2020 visit was testimony from Petitioner

who testified that the parents "came, arrived late" and "the visit ended early." The

details in Finding 15 appear to be a recitation of the allegations in the petition and

are unsupported by any record evidence. *See In re H.P.*, 278 N.C. App. 195, 204, 862

S.E.2d 858, 866 (2021) ("The trial court's findings must be more than a recitation of

allegations." (brackets, ellipsis, and citation omitted)).

***Finding of Fact 16***

Finding 16 states:

> The parents elected not to visit in May 2020 due to COVID.
> Petitioners offered a FaceTime visit instead, but the
> parents did not respond.

There is clear, cogent, and convincing evidence to support the first sentence of

this finding but not the second sentence. The record is devoid of evidence showing that Father did not respond to an offer for a FaceTime visit and, instead, the record shows that the parents texted Petitioners in May 2020 to ask about "video chatting" with the children. The parents explained that they did not have iPhones and could not FaceTime, and they asked Petitioners if they would download another app called Duo in order to see the children.

### *Finding of Fact 17*

Finding 17 states:

> The parents did not visit in August 2020. Petitioners booked tickets for the museum but never received a request or confirmation for a visit from either parent.

There is not clear, cogent, and convincing evidence to support this finding of fact. The only evidence in the record shows that a visit did not occur in August 2020 due to COVID. Although Ms. Dempsey testified that they had purchased a yearly museum membership for everyone, there is no evidence to support that Petitioners never received a request or confirmation for a visit from Father and, in fact, Ms. Dempsey's testimony was that the August 2020 visit did not take place due to COVID. The details in Finding 17 appear to be a recitation of the allegations in the petition and are unsupported by any record evidence. *See id.* ("The trial court's findings must be more than a recitation of allegations." (brackets, ellipsis, and citation omitted)).

### *Finding of Fact 18*

Finding 18 states:

> The mother, her three year old and the maternal grandmother came for the November 2020 visit. Petitioners planned to meet them at the gate of the museum at 10:30am. The maternal grandmother met with Petitioners and the minor children while the mother walked around the museum with the three year old until 11:15am. At 11:40am the mother left to go to her car but returned to the museum café for lunch with everyone at 12:05pm. At 2pm the mother, the three year old and the maternal grandmother left to go home. The mother and maternal grandmother did not interact with the minor children during the visit.

We note that this finding does not pertain to Father, but Father specifically challenges it on appeal and argues that there is not clear, cogent, and convincing evidence to support this finding of fact. We agree. The only evidence in the record about this specific visit is testimony from Ms. Dempsey who testified that the November 2020 visit "was the same as pretty much all the others, as far as there was not much interaction with [the children]." There is no evidence to support the details in Finding 18, which appears to be a recitation of the allegations in the petition. *See id.* ("The trial court's findings must be more than a recitation of allegations." (brackets, ellipsis, and citation omitted)).

### *Finding of Fact 19*

Finding 19 states:

> The mother and father did not request a visit for February 2021, May 2021, or August 2021.

There is not clear, cogent, and convincing evidence to support that Father did not request visits. The record evidence shows only that visits did not occur in

February, May, and August 2021, and that Ms. Dempsey cancelled the August 2021

visit due to a family illness and the parents could not come to the re-scheduled visit.

### Finding of Fact 20

Finding 20 states:

> The mother, the maternal grandmother, the father and the paternal grandparents attended the visit in November 2021. There was minimal interaction with the minor children.

There is not clear, cogent, and convincing evidence to support this finding of

fact. The record is completely silent as to the interaction between Father and the

children during the visit in November 2021. When Ms. Dempsey was asked if she

remembered "anything of note with that visit[,]" she testified, "Not anything extra

that stands out." There is otherwise no other record evidence about the November

2021 visit. Finding 20 appears to be a recitation of the allegations in the petition.

*See id.* ("The trial court's findings must be more than a recitation of allegations."

(brackets, ellipsis, and citation omitted)).

### Finding of Fact 21

Finding 21 states:

> The mother and father did not request to have visits in February and May of 2022.

There is not clear, cogent, and convincing evidence to support that Father did

not request visits. The only record evidence about these visits is Ms. Dempsey's

testimony that, to her recollection, there were not any visits in February and May of

2022.

### *Finding of Fact 23*

Finding 23 states:

> The mother and the father did not confirm the November of 2022 visit in sufficient time for the visit to occur. Petitioner Mariah Dempsey offered to reschedule the visit for the following week. The parties agreed to have a visit at Frankie's Fun Park. The father attended the visit with his parents, his sister, his niece and his nephew. The father provided $20 for the minor children to share to play games, and he also provided each of the children with a Christmas gift. The father and his family spent little time interacting with the children. Instead, the father spent the majority of the visit walking around playing video games. At one point the father asked permission to take [Terry] with him to play a game, and Petitioners agreed. After five minutes, the Petitioners walked over to where the father was to check on [Terry], but the father was playing a video game alone without [Terry] anywhere in sight. Petitioner Mariah Dempsey walked around to look for [Terry], and she found him standing alone on the other side of the arcade.

Father challenges the portion of this finding that he "did not confirm the November of 2022 visit in sufficient time for the visit to occur. Petitioner Mariah Dempsey offered to reschedule the visit for the following week." We agree that there is not clear, cogent, and convincing evidence to support this challenged portion of Finding 23. Ms. Dempsey testified about the November 2022 visit but said nothing about Father failing to confirm the visit or rescheduling the visit. There is no record evidence to support the challenged portion of Finding 23.

### *Finding of Fact 28*

Finding 28 states:

> The parents have not attended to the children's physical, emotional or financial needs. They have not provided any financial support for the minor children, and they do not regularly provide gifts, cards or letters for the minor children. The father provided a small toy animal bucket for [Terry] and a bracelet set for [Tiffany] and [Tara] to share in December 2020. In January of 2021 the mother sent an online card to the minor children that said "hi." [Father and Mother] have not otherwise provided any birthday or Christmas gifts to the minor children since Petitioners have been the minor children's guardians. . . .

There is not clear, cogent, and convincing evidence to support that Father has not provided any financial support for the minor children, does not regularly provide gifts, cards, or letters for the children, and has not otherwise provided any birthday or Christmas gifts for the minor children. Father testified that he has been paying child support specifically for Tiffany, Tara, and Terry and that those payments are not going towards his other children, and the record contains evidence of Father's pay stubs which show that $159.92 is garnished from each paycheck for child support. There is additional evidence in the form of payment history reports which further show that Father pays $325 monthly for "CS – Child Support." There is also abundant evidence that Father provides gifts and items to the children. Ms. Dempsey testified that Father brought gifts to the November visits and provided Terry with a Nerf gun and a book, and that Father "was pretty consistent" with sending gifts and items for the children at Christmas. She testified that Father "would order something online . . . for me to be able to go pick up and bring to the kids from him."

### Finding of Fact 29

Finding 29 states:

> The parents could have continued to comply with the orders of the court in order to increase their visitation with the minor child, but they elected not to do so.

This finding does not specify which orders Father did not comply with or what Father elected not to do. The court awarded guardianship to Petitioners by order entered 10 January 2020; in that order, the trial court found that the "primary plan of guardianship is being achieved at this time" and it waived future hearings. However, the order also provided that the "visitation provisions . . . may be reviewed upon motion for review by any party." Finding 29 is supported to the extent that Father could have filed a motion with the trial court in order to increase his visitation with the children.

### Finding of Fact 31

Finding 31 states:

> The father is unable to drive legally at this time. He suffers from seizures, and each time he has a seizure, he must wait a minimum of six months before attempting to reinstate his driver's license. In addition, the father has some legal matters he must settle before he is eligible to obtain his driver's license.

Father agrees that the first two sentences of Finding 31 are supported, but argues that the last sentence is unsupported. Upon our review of the record evidence, we agree that there is not clear, cogent, and convincing evidence to support that

Father had "some legal matters" to settle before he could obtain his driver's license. The testimonial evidence shows that Father had a speeding ticket at one point, but that the speeding ticket had been paid, and that Father's lack of health insurance prevented him from obtaining an eye exam in order to obtain his driver's license. This evidence does not support that Father had "some legal matters" to settle before he could obtain his driver's license.

### Finding of Fact 35

Finding 35 states:

> The parents' ability to properly supervise the minor children is still a concern given the father's inability to adequately supervise [Terry] during the last visit and the mother's failure to interact with the minor children during her last several visits.

There is clear, cogent, and convincing evidence to support that Father inadequately supervised Terry during a visit in November 2022. While Father was visiting with the children at an arcade and fun park, Terry walked away from Father while they were playing video games. Father testified that he was playing a game with Terry when Terry walked away from him, and Ms. Dempsey testified that Father was playing a game while Terry "was on a whole other row out of sight, out of vision from [Father]." There is clear, cogent, and convincing evidence to support that Father inadequately supervised Terry during the November 2022 visit.

### Finding of Fact 36

Finding 36 states:

> While the parents have been able to maintain custody of their youngest child, they still have an ongoing foster care case in Wake County with an older child who was removed in 2015 along with the other children. They still have not been able to reunify with that child. This shows that the conditions which brought the minor children into care still have not been corrected almost eight years later. The parents have willfully left the minor children in an out of home placement, and they have not made reasonable progress at correcting the conditions which brought the children into care.

There is clear, cogent, and convincing record evidence to support the finding that the parents have custody of their youngest child. There is not clear, cogent, and convincing evidence that they have an older child in foster care and "still have not been able to reunify" with their older child as the record is devoid of evidence as to whether they have made efforts to reunify with this child. At the time of the TPR hearing, the parents appear to have had a child who was approximately seventeen-and-a-half years old. The most recent record evidence about that child is a February 2021 report showing that he was in a stable foster home, the recommended plan for him was guardianship, and that no permanent plan had been achieved. That same report stated that Father "participated in all the agency meetings," "showed interest in the children, listened to them and gave them advice. He participates in weekly phone visitations also." There is no record evidence indicating what happened in that child's case between the February 2021 report and the TPR hearing in 2023. Accordingly, contrary to the third sentence, the previous findings do not necessarily "show[] that the conditions which brought the minor

children into care still have not been corrected almost eight years later." The fact that the parents maintain custody of their youngest child directly contradicts the finding that they have not corrected the conditions that led to Tiffany, Tara, and Terry's removal. The remainder of this finding is, in fact, a conclusion of law that is not supported by the findings of fact, as we address more in depth below.

### *Finding of Fact 38*

Finding 38 states:

> Other than maintain custody of their new child, the parents are in the same position as they were when the children initially came into care. They have not consistently visited with the minor children. They do not have suitable housing. There is no evidence before the court that they have received adequate mental health counseling.

There is not clear, cogent, and convincing evidence to support that Father is in the same position as he was when the children first came into care, that he does not have suitable housing, and that he has not received adequate mental health counseling. The record evidence shows that Father complied with his case plan; that Father moved to South Carolina to live with his parents following his stroke and that there was no requirement that he have independent housing; and that Father completed a psychological evaluation as ordered by WCHS and was in therapy on a monthly basis. There is clear, cogent, and convincing evidence that Father did not consistently visit with the minor children.

### *Finding of Fact 39*

Finding 39 states:

> The parents have neglected the minor children, and there is a probability of a repetition of neglect if the minor children were returned to their care. This is evidenced by the father's decision to play video games by himself during the most recent visit and by the mother electing to tour the museum with her other child instead of spending time with the minor children during their very limited visitation. Not only do the parents continue to neglect the minor children outside of visits, they neglect them during their visits as well.

The first sentence of this finding is essentially a conclusion of law that is not supported by the findings of fact, as we address more in depth below. There is clear, cogent, and convincing evidence to support the portion of Finding 39 that Father decided to play video games by himself during the November 2022 visit. Father testified that he was playing a game with Terry during the November 2022 visit and that Terry walked away from him, thus leaving Father to play the video game by himself. Ms. Dempsey's testimony supported this version of events as well, explaining that Terry was out of Father's sight and not even on the same row of video games as Father, thus leaving Father to play the game alone.

### *Finding of Fact 41*

Finding 41 states:

> The minor children were originally removed from the parents' custody in 2015 due to their inability to properly care for their minor children. The parents technically complied with services in that they attended services, but they did not benefit from the lessons taught in their services.

There is clear, cogent, and convincing evidence to support that the children were originally removed in 2015 due to the parents' inability to properly care for the children and that the parents complied with the services ordered by WCHS. However, there is not clear, cogent, and convincing evidence that Father did not benefit from the lessons taught in those services. The record evidence shows that, when WCHS initiated services with Father and Mother in 2014, there were concerns that, inter alia, the children's medical needs were not being met; that the children were dirty and smelling of urine; and that Father and Mother's home was unsanitary due to the amount of trash, dirty dishes, and floors covered with trash and food. Father complied with services ordered by WCHS, and following Father's stroke at the end of 2016 and his subsequent move to South Carolina, the South Carolina Department of Social Services ("SCDSS") evaluated Father and Mother's home in June 2018. SCDSS noted that Father and Mother had custody of their youngest child, determined that the home was "neat, clean and free of any observable safety hazards," but still noted concerns about Father's stability of employment, lack of reliable transportation, and need for a psychological assessment. Father completed a psychological assessment in December 2018 and was able to answer questions about how he would know to take his children to the doctor; how he would make a home safe for a toddler or child; how he would properly discipline children if they misbehaved; and other parenting questions. The record evidence shows that Father benefitted from services despite the children remaining in foster care and

guardianship.

### *Finding of Fact 43*

Finding 43 states:

> The parents have not sufficiently learned about the special
> needs of [Tiffany]. She attends school in an exceptional
> children's classroom and has a one-on-one aid during the
> school day. Since moving to Petitioner's home, she has
> surpassed the developmental and educational expectations
> of her doctor.

There is clear, cogent, and convincing evidence to support the last two

sentences of Finding 43, but not to support that Father has not sufficiently learned

about Tiffany's special needs. Father testified that he knew Tiffany had emotional

limitations and challenges and that Tiffany was in her own independent class setting,

but the record evidence is otherwise silent as to whether Father had sufficiently

learned about Tiffany's special needs.

### *Finding of Fact 44*

Finding 44 states:

> During visits the parents have sought the assistance of
> Petitioner Mariah Dempsey as well as that of their older
> son . . . to help with the minor children during the visit.
> [Their older son] is diagnosed with autism and has a
> moderate to severe intellectual disability, yet the father
> asked him to help with his younger siblings. The parents
> have had 8 years to remedy the conditions which brought
> the minor children into care, and they have not done so.

Father argues that the last sentence is not supported by clear, cogent, and

convincing evidence. The children first came into WCHS custody due to concerns

about the children's hygiene and the condition of the family's home, and allegations that the parents failed to meet the children's medical needs. There is not clear, cogent, and convincing evidence that those are current concerns for the children as they have been in guardianship placement since January 2020; WCHS was relieved of supervisory responsibility for the family and was no longer monitoring the family; and the record evidence shows that Father is working part-time and living with his parents in South Carolina following his stroke, that he has retained custody of the youngest child Father shares with Mother, and that there has been no child protective services involvement in South Carolina with Mother and Father.

### *Finding of Fact 59*

Finding 59 states:

> The parents have shown a deliberate indifference towards
> support and care of the minor children.

There is not clear, cogent, and convincing evidence to support that Father has shown a deliberate indifference towards support and care of the minor children. The record evidence shows that Father complied with services ordered by WCHS, consistently called the children on a weekly basis, has paid child support for the children, and has sent gifts and items to the children.

## D. Conclusions of Law

Here, the trial court terminated Father's parental rights on the grounds of neglect and lack of progress.

### 1. *Conclusion of Neglect*

The trial court's Finding 39 that "the parents have neglected the minor children, and there is a probability of a repetition of neglect if the minor children were returned to their care" is essentially a conclusion of law that we review de novo on appeal. *In re M.N.C.*, 176 N.C. App. at 122, 625 S.E.2d at 632. The trial court also specifically concluded that "[t]he parents have neglected the minor children within the meaning of N.C. Gen. Stat. § 7B-101(15), and there is a probability of a repetition of neglect if the minor children were returned to their care."

Here, the children have been separated from Father for more than six years, they have been in guardianship with Petitioners for more than four years and permanency has been achieved, and Father's personal interactions with the children have been limited to in-person visits four times per year and weekly phone calls. The supported findings of fact and record evidence indicate that Father was compliant with his case plan with WCHS before that plan was ceased, is working, is in therapy, consistently calls the children every Sunday evening and is appropriate during the phone calls, pays child support, and consistently sends gifts to the children. As the children have achieved permanency through the guardianship, the supported findings and record evidence do not support a conclusion that there is a likelihood that Father will neglect the children in the future. *See In re R.L.D.*, 375 N.C. at 841, 851 S.E.2d at 20; *see also In re A.L.L.*, 376 N.C. at 113, 852 S.E.2d at 11 (explaining the protections afforded parents whose children are in guardianship and noting that

"a permanency guardianship allows parents whose children cannot be returned to them to have a meaningful opportunity to maintain a legal relationship with their children").

### 2. *Willful Failure to Make Reasonable Progress*

The trial court's Finding 36 that "the parents have willfully left the minor children in an out of home placement, and they have not made reasonable progress at correcting the conditions which brought the children into care" is essentially a conclusion of law that we review de novo on appeal. *In re M.N.C.*, 176 N.C. App. at 122, 625 S.E.2d at 632. The trial court also specifically concluded:

> The parental rights of the parents are subject to termination pursuant to N.C. Gen. Stat. § 7B-1111 (a)(2) in that they willfully left the minor children in a placement out of the home for more than twelve months without showing to the satisfaction of the Court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juveniles, and poverty is not the sole reason they cannot care for the juveniles.

The children came into custody in 2015 due to concerns about the children's hygiene, the condition of the family's home, and that the parents could not meet the children's medical needs. The findings and record evidence do not show those issues to be current concerns as the children have been in foster placement with Petitioners since September 2017 and February 2018 and then in guardianship placement with Petitioners since January 2020, and they have been making good progress while in Petitioners' care. Moreover, during this time period, Father suffered a stroke and

seizure disorder, yet he complied with his case plan with WCHS until the order awarding guardianship relieved WCHS "of supervisory responsibility for this family as it pertains to these children," released the guardian ad litem and court-appointed attorneys for the parents, and waived future hearings for the children.

After the guardianship was established, Father was permitted to see the children four times a year and speak to them on a weekly basis, and Father consistently spoke with the children on a weekly basis. Father maintained employment, provided child support, and also sent gifts to the children. As "[w]illfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort[,]" we cannot conclude that Father's actions evince a willful failure to make reasonable progress in correcting the conditions which led to the children's removal. *In re McMillon*, 143 N.C. App. 402, 410, 546 S.E.2d 169, 175 (2001) (citations omitted). We conclude that Father made reasonable progress under the circumstances of the guardianship placement. *In re L.C.R.*, 226 N.C. App. 249, 252, 739 S.E.2d 596, 598 (2013) ("[T]he conditions which led to removal are not required to be corrected completely to avoid termination. Only reasonable progress in correcting the conditions must be shown."); *see also In re A.L.L.*, 376 N.C. at 113, 852 S.E.2d at 11 (explaining the protections afforded parents whose children are in guardianship and noting that "a permanency guardianship allows parents whose children cannot be returned to them to have a meaningful opportunity to maintain a legal relationship with their children").

### III. Conclusion

For the reasons stated herein, we reverse the order of the trial court terminating Father's parental rights to Tiffany, Tara, and Terry.

REVERSED.

Judges STROUD and WOOD concur.